**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 04a0148n.06
Filed: December 6, 2004

**No. 03-6069**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ANN MOSTOLLER, TRUSTEE, | ) | |
| | ) | |
| *Plaintiff-Appellant*, | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| v. | ) | District of Tennessee |
| | ) | |
| CWCAPITAL, LLC, | ) | |
| | ) | |
| *Defendant-Appellee*. | ) | |

**Before:** **BOGGS, Chief Judge; GILMAN, Circuit Judge; and WEBER, District Judge**[*]

**PER CURIAM.** This is a contract dispute centered on a HUD-backed loan for a housing development. Plaintiff-Appellant Mostoller, Bankruptcy Trustee for West Pointe, appeals from the district court's order granting summary judgment to defendant CWCapital in a suit for breach of contract. Appellant argues that CWCapital breached the contract by declaring West Pointe in default. We find that the contract plainly authorized CWCapital to declare a default if West Pointe failed to meet the construction deadline, and we therefore affirm.

---

[*]The Honorable Herman J. Weber, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

**I**

On August 7, 1996, West Pointe (now in Chapter 7 and represented by Mostoller), obtained a HUD-insured loan from Continental Wingate ("CW") (CWCapital's predecessor). The loan was to support the construction of a low-to-medium-income residential housing complex, which was to have 33 acres and 150 home units, as well as swimming pools and other facilities. In connection with the loan, the parties executed a number of documents (collectively "loan agreement") governing construction, repayment, and other requirements. The loan agreement required West Pointe to make monthly payments of interest for the first eleven months, and then to repay both interest and principal.

Among other conditions, the loan agreement included two requirements at issue in this case: (1) West Pointe must complete construction by July 7, 1997, and (2) West Pointe must make all payments when due. If West Pointe failed to meet either of these requirements, CW could declare the loan in default. Upon default, CW was authorized to accelerate the loans and demand full repayment immediately. HUD had all responsibility for inspecting the progress of the construction project and determining whether the pace and quality of construction met requirements.

The loan agreement provided that "no waiver by [CW] of any event of default [would] operate as a waiver of any other event of default or the same event of default on a future occasion." Moreover, CW could "delay in exercising or omit to exercise any right or remedy . . . without waiving that or any past, present or future right or remedy." Also, the loan agreement specifically stated that it could be modified only in writing.

A. Problems with Construction (or lack thereof)

West Pointe contracted with Hicks Excavating ("Hicks") to serve as the general contractor on the project. Hicks was required to finish construction by February 7, 1997, so that West Pointe could begin repaying loan principal by July 7, 1997. Changes to the construction contract had to be approved by HUD and CW in writing.

From an early date, HUD reported slow and problematic construction. In January 1997, West Pointe, with CW's consent, submitted a request to HUD for an additional six-month extension beyond the February 7 deadline in the construction contract. HUD denied the six-month extension, but, in light of rain delays, granted West Pointe an additional eighty-seven days to May 5, 1997. Even with the extension, West Pointe could not complete construction on time. On May 8, 1997, it requested another extension from HUD. In a July 9 letter, HUD's representative stated that "additional time to complete the work has not been justified as required by the general conditions . . . . [M]y staff has not observed a proper, concerted effort . . . to complete the job in a timely manner." Ronald Frye, the president of West Pointe, acknowledged a litany of problems that arose during construction, ranging from unpaved roads to lot grading to faulty piping installation.

Hicks, the general contractor, pulled off the project twice in July and August because of disputes with West Pointe. After Hicks returned briefly, West Pointe kicked Hicks off the work-site in October 1997. After Hicks left the work-site in October, West Pointe was unable to retain another general contractor or induce Hicks to return. At this point the project was about 25% complete.

On November 5, 1997, HUD advised CW that West Pointe may have violated the loan agreement, and recommended that CW not advance further funds and "review the options available

to them under default." HUD identified a number of possible violations of the loan agreement by West Pointe, including problems with construction and failure to make required payments.

In addition to the construction problems, West Ponte failed to make full and timely payments on the loan. West Pointe never paid the $23,566 required by HUD as part of a fourth change order. The fourth change order was necessitated by problems with the water piping. HUD approved the change, but required West Pointe to pay the increased costs out of its own pocket by depositing the amount of the cost increase – $23,566 – with CW. In addition, West Pointe failed to make the scheduled payment of interest and principal for October 1997. Instead, it submitted a request for an additional advance against the loan.

B. Default and Foreclosure

On December 10, 1997, CW declared West Pointe in default. CW exercised its right to accelerate the loan and demand repayment. Shortly thereafter, CW assigned the loan to HUD, pursuant to HUD regulations.

HUD gave West Pointe several opportunities over the next year to show why HUD should not foreclose. After a full hearing, HUD concluded that the project could not be salvaged and, on November 9, 1998, declared its intent to foreclose. In the hopes of staying foreclosure, West Pointe filed for bankruptcy. The bankruptcy court, however, granted HUD's request for relief from the automatic bankruptcy stay, and foreclosure proceeded. HUD sold West Pointe's property to the highest bidder for $350,000.

C. Proceedings Below

The Trustee for West Pointe ("West Pointe") brought this suit for breach of contract. West

Pointe claimed that HUD and CW were jointly and severally liable for damages resulting from the declaration of default and foreclosure. West Pointe sought $25 million in compensatory damages and $50 million in punitive damages. It alleged that oral modifications of the contract provided for an indefinite extension of construction deadlines. It also alleged that the July 9, 1997, letter from HUD extended the completion date for the project indefinitely.

In its first grant of summary judgment, the district court dismissed as speculative West Pointe's claim for damages associated with "Phase II" of the project. Phase II involved a second parcel of undeveloped land that was adjacent to the land being developed by the HUD-backed loan. At no time was West Pointe the owner of the Phase II land. Although West Pointe had an option to acquire that land, that option expired on August 30, 1997, more than two months before the default. At no time did CW or any other party agree to finance the development of Phase II. The district court concluded that damages based on Phase II were entirely speculative.

In July 2003, the district court granted summary judgment for CW and HUD on all remaining issues. The district court found that West Pointe had violated the loan agreement in three ways. First, West Pointe failed to complete construction on schedule. Second, it failed to pay the $23,566 required by the change order. Third, it failed to make the required October interest payment.

The district court rejected West Pointe's claim that the contract had been modified. The court concluded that HUD regulations and the terms of the contract prohibited oral modification of the loan agreement. The court also found that any oral modification by a HUD official would be void because that HUD official clearly lacked authority to enter into such modification. Finally, the court found that the July 9 letter, on its face, did not modify the loan agreements. Therefore, West

No. 03-6069
Mostoller v. CWCapital

Pointe's failure to complete the project on time was a valid basis to declare it in default.

The court also found that West Pointe violated the contract by failing to pay the interest for October and the $23,566 required by the change order. With respect to the October interest payment, it found that there was "no basis" for West Pointe's claim that another request for an advance on the loan satisfied the payment requirement.

This appeal followed. On appeal, West Pointe has dropped all claims against HUD.[1]

## II

We review summary judgment decisions *de novo*, taking all facts in the light most favorable to the non-moving party. *Michigan Express, Inc. v. United States*, 374 F.3d 424, 426 (6th Cir. 2004).

Under the loan agreement, West Pointe was required to complete construction by July 7, 1997. It is undisputed that it did not. It is also undisputed that failure to meet the construction deadline is sufficient basis for a declaration of default. Thus, if the plain terms of the contract apply, CW's declaration of default was not a breach of the contract.

Not surprisingly, West Pointe raises several arguments against applying the plain terms of the loan agreement. At bottom, West Pointe's claim is that by not declaring a default on July 7, 1997 – the original deadline for construction – and through its subsequent actions, CW somehow forfeited its rights to make such a declaration later. West Pointe, somewhat vaguely, argues that

[1]West Pointe tried to dismiss HUD as a party late in the proceedings below. The district court issued summary judgment on all remaining issues before considering the motion to dismiss HUD.

- 6 -

"[m]any labels" could be applied to this theory, and offers modification, waiver, and estoppel as possibilities.[2]  These arguments are without merit.  Because we believe that West Pointe's failure to meet the construction deadline is dispositive, we need not reach the remaining issues before us.

Federal law governs the interpretation of a HUD-backed loan, and the rights and liabilities of the parties under such a loan.  *United States v. Scholnik*, 606 F.2d 160, 164 (6th Cir. 1979). Federal regulations prohibit modification of a federally insured loan except through a written agreement.  24 C.F.R. § 207.256(b).  Therefore, doctrines of waiver and estoppel cannot modify the terms of a HUD-insured loan.  *United States v. Victory Highway Village, Inc.*, 662 F.3d 488 (8th Cir. 1981).  On this basis, courts have consistently held that provisional or informal agreements cannot modify the terms of a HUD-backed loan.  *See id.* at 495-98; *Bayvue Apartments Joint Venture v. Ocwen Federal Bank FSB*, 971 F. Supp. 129, 131-32 (D.D.C. 1997) (HUD-insured mortgage cannot be altered by de facto modification doctrine because of the writing requirement of 24 C.F.R. § 207.256(b)).  In addition, the plain terms of the loan agreement itself prohibit modification except through a written instrument.

West Pointe argues that the July 9, 1997 HUD letter directed the parties to extend the contractual deadline indefinitely.  As the district court noted, the letter plainly does the opposite. The letter begins by identifying that an extension of time – eighty-seven days – has already been

---

[2]However, on appeal, West Pointe abandons its claim of oral modification.  Oral modification of a loan is flatly prohibited by the Tennessee Statue of Frauds, Tenn. Code Ann. § 29-2-101(b)(1) (prohibiting oral modifications of a loan contract), and by the plain terms of the contract itself.  HUD regulations also require that modifications to HUD-backed loans be in writing.  24 C.F.R. § 207.256(b).

granted, but it then states "additional time to complete the work has not been justified."

West Pointe also argues that once the July 7 deadline passed without a declaration of default, the parties were operating under the Extension Agreement, which has no deadline. The Extension Agreement was executed along with other parts of the loan agreement on August 7, 1996. It provides that if construction is not complete by August 7, 1997, West Pointe must pay additional interest fees. The Extension Agreement specifically disclaims any modifications of the deadline or any other requirement in the loan agreement:

> Notwithstanding anything to the contrary set forth herein, Lender's right to receive fees for extending the date of Final Endorsement shall not be construed to give to Mortgagor the right to any extension . . . . The Obligor acknowledges that Lendor is not obligated to grant any extensions by reason of this Agreement and that granting of one or more extensions shall not obligate Lendor to grant any additional or further extensions.

The Extension Agreement expressly does not modify any deadlines and therefore does not support the interpretation given it by West Pointe.

Next we have the somewhat vague waiver and estoppel arguments – these appear to be the same argument in two guises. West Pointe argues that by not declaring default on July 7 and continuing to work on the project, CW waived the construction deadline, or, alternatively, should be estopped from enforcing the construction deadline because West Pointe reasonably incurred costs in the belief that the construction deadline had been indefinitely extended. As we stated above, federal law on this subject is clear: a HUD-guaranteed loan can only be modified in writing. 24 C.F.R. § 207.256(b); *Victory Highway*, 662 F.3d at 495-98. Therefore common law doctrines of waiver and estoppel cannot modify the terms of a HUD-guaranteed loan.

In addition, West Pointe's waiver and estoppel claims are baseless even if we apply

Tennessee common law. The only support West Pointe identifies for its claim is the failure to declare default on July 7 and CW's subsequent effort to keep working with West Pointe. The mere failure to declare a default at the earliest possible date is insufficient to establish an indefinite waiver of that deadline. It is undisputed that CW never told West Pointe that it was extending the deadline or that it would even consider it. West Pointe cites no authority to suggest there is any jurisdiction that would find waiver or estoppel on this basis.

We therefore find that West Pointe violated the loan agreement by failing to complete construction as scheduled. CW was thus acting within its contractual rights when it declared West Pointe in default.

## III

Because we have determined that CW acted within its contractual rights when it declared West Pointe in default, we need not consider the remaining claims. Since CW did not breach the contract, it is unnecessary to determine whether Phase II damages are speculative. Likewise, it is immaterial whether West Pointe also violated the loan agreement by failing to make required payments. Whether West Pointe failed to meet its contractual obligations in many ways or in only a single way, CW was equally within its rights to declare default. We note, however, that we agree with the district court's analysis with respect to Phase II damages and West Pointe's failure to make required payments.

For these reasons, we AFFIRM the judgment of the district court.